IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA YOUNG O/B/O | : | |
| J.C. (MINOR), | : | CIVIL ACTION |
|      Plaintiff | : | |
| | : | |
|   v. | : | |
| | : | |
| JO ANNE BARNHART, | : | |
| Commissioner of Social Security, | : | |
|      Defendant | : | No. 05-CV-5226 |

## <u>REPORT AND RECOMMENDATION</u>

TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE

     Plaintiff J.C., by and through her mother, Lisa Young, seeks judicial review of the

decision of the Commissioner of Social Security ("Commissioner") denying her claim for child's

supplemental security income ("CSSI"). After filing a request for review of the Administrative

Law Judge's ("ALJ") conclusion that she was not disabled under the Social Security Act, J.C.

submitted additional evidence to the Appeals Council that had not been considered by the ALJ.

The Appeals Council made the additional evidence part of the record and subsequently denied

J.C.'s request for review, rendering the ALJ's determination the final decision of the

Commissioner.

     J.C. argues on appeal that the ALJ's finding of only a "less than marked," and not a

"marked," impairment in the domain of interacting and relating to others was not supported by

substantial evidence. J.C. requests the ALJ's decision be reversed and benefits be granted. J.C.,

however, relies on additional evidence that was not considered by the ALJ. The district court

may affirm, modify, or reverse the Commissioner's decision based only on the record before the

ALJ.  Matthews v. Apfel, 239 F.3d 589, 592 (3d. Cir. 2001).  Remand is warranted where, as

here, additional evidence has been submitted that is new, material, and the plaintiff has

demonstrated good cause for its late submission.  Id.

In addition, remand is required on an issue not raised by the plaintiff.  The ALJ is

required to explain her finding that the plaintiff and her mother, Lisa Young, were not credible.

Accordingly, I respectfully recommend the matter be remanded for further review to

consider whether the new evidence changes the ALJ's determination of J.C.'s limitation in the

domain of interacting and relating to others, and for an explanation of the ALJ's adverse

credibility finding.

## BACKGROUND

### A.  Procedural History

J.C. was born prematurely on September 19, 1991 and was 13 years old at the time of the

ALJ's decision. (R at 14, 32).  Her father has been incarcerated through most of J.C.'s life and

her mother, Lisa Young, has been physically disabled since 1988 when she suffered two

aneurysms and a stroke, losing mobility on the left side of her body.  Lisa Young is largely

wheelchair-bound, able to use a quad cane only at home, and receives Social Security disability

benefits. (R at 96-97, 212-213).

On July 16, 2003, Lisa Young applied for disability benefits on behalf of J.C., alleging

disability since June 1, 2003. (R at 32-49).  On December 17, 2003, the state agency denied her

application, and J.C. requested review by an ALJ. (R at 25-28).  On August 19, 2004, the ALJ

heard testimony from J.C., Lisa Young, and therapist Diane Townes. (R at 204-246).  On

September 24, 2004, prior to the ALJ's decision, J.C.'s counsel submitted evidence of J.C.'s

hospitalization for suicidal thoughts on September 12, 2004.  That evidence – an intake

assessment and consultation notes from The Children's Hospital of Philadelphia where J.C. was

hospitalized – was marked as an exhibit for the ALJ's consideration. (R at 151-155).

Six days later, the ALJ issued a written denial of J.C.'s claim. (R at 13-17).  The ALJ,

determined that although J.C. had not engaged in substantial gainful activity since the alleged

onset of her disability, and although her opposition defiant disorder[1] ("ODD") and impulse

control disorder[2] were severe, her impairments did not meet, medically equal, or functionally

equal the severity of a Listed impairment.[3]  The ALJ found J.C. had a "marked" limitation in the

---

[1]Opposition defiant disorder is "a type of disruptive behavior disorder characterized by a recurrent pattern of defiant, hostile, disobedient, and negativistic behavior directed towards those in authority, including such actions as defying the requests or rules of adults, deliberately annoying others, arguing, spitefulness, and vindictiveness that occur much more frequently than would be expected on the basis of age and developmental stage." Dorland's Illustrated Medical Dictionary 550 (30th ed. 2003).

[2]Impulse control disorder is "characterized by repeated failure to resist an impulse to perform some act harmful to oneself or to others.  The person feels tension or an irresistable urge to perform the act which, even though [repugnant, distressing, or unacceptable], gives pleasure or emotional release upon performance." Dorland's Illustrated Medical Dictionary at 549, 592.

[3]To determine whether a child under the age of 18 is disabled for the purpose of receiving CSSI benefits, the ALJ considers the following, in sequence: (1) whether the child is working; (2) whether the child has a medically determinable "severe" impairment or combination of impairments; and (3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of a Listed impairment.  20 C.F.R. § 416.924.
    A child's impairment is considered of "Listing-level severity" if it causes a "marked" limitation in two domains -- or categories -- of functioning, or causes an "extreme" limitation in one domain of functioning.  This involves an inquiry into the impact of the child's impairment on day-to-day functioning and whether the child's activities are typical of other children that age who have no impairments.  20 C.F.R. § 416.926a(b).  A limitation is considered "marked" if the impairment "seriously interferes" with the ability to independently initiate, sustain or complete activities.  Id. § 416.926a(e)(2).
    The domains, or categories, reviewed under this standard are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4)

3

domain of caring for herself and a "less than marked" limitation in interacting and relating to

others.  If J.C.'s impairment had been determined to cause a marked limitation in both domains,

she would have been considered disabled and entitled to CSSI benefits.

In reaching her decision, the ALJ did not consider the additional evidence J.C. submitted

on September 24, 2004.  In addition, the ALJ found J.C. and her mother "not fully credible," but

failed to explain the adverse credibility determination. (R at 17).

Subsequent to filing a request for Appeals Council review, on April 14, 2005, J.C.

submitted additional evidence, which the Appeals Council made part of the administrative

record.  Included in this submission was the evidence that had been filed with the ALJ on

September 24, 2004, specifically, the intake assessment and consultation notes from The

Children's Hospital of Philadelphia where J.C. was hospitalized for suicidal thoughts on

September 12, 2004.  On August 4, 2005, the Appeals Council denied plaintiff's request for

review. (R at 4-7).

**B.  Evidence Before the ALJ**

On June 13, 2003, J.C. began attending Alternatives to Placement, where she was

examined and began receiving therapy from Dr. Phyllis Pole and medication management from

Dr. Cecil Harris. (R at 101-106, 209-225)  An evaluation prepared at Alternatives to Placement

on June 13, 2003 noted J.C.'s problems to be anger, lying, sneaking out of the home, sexual

activity beginning at the age of 9, hyperactivity, short attention span, poor impulse control, poor

self esteem, and poor social skills. (R at 103-112)  J.C. was diagnosed with ODD and adolescent

---

moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-
being.  Id. at § 416.926a(b)(1)(I) - (vi).

antisocial behavior by Dr. Pole, and, on July 6, 2003, J.C. was diagnosed with attention deficit hyperactivity disorder[4] ("ADHD") by Dr. Harris. (R at 102).

On August 18, 2003, prior to J.C. entering sixth grade, Lisa Matthews, J.C.'s school teacher, voiced concern about J.C.'s social and emotional growth and behavior over the previous year. (R at 94).  In a letter to Lisa Young, Matthews urged continued counseling for J.C. and noted inappropriate behavior such as the following:  speaking disrespectfully to authority figures, refusing to do what adults asked her to do, receiving several detentions, name calling, teasing and fighting with other students, and engaging in sexual activity.  Matthews also noted J.C. was having problems involved in living with her mother's disability. (R at 94).

During J.C.'s sixth grade year, which began in fall, 2003, in spite of doing well academically, (R at 80-81, 214), J.C.'s behavior prompted several notes from school authorities addressed to Lisa Young reporting various angry, aggressive, destructive, and disrespectful acts of J.C.'s, including slinging her scarf against other students in class, fighting, drinking alcohol on the school bus, and continually not listening and being disrespectful to teachers.  J.C. faced at least two possible suspensions from school as a result of her behavior. (R.82-90).

On June 22, 2004, J.C. was admitted to the Belmont Center for Comprehensive Treatment for running away after making threats about wanting to hurt herself and wanting to kill her mother.  Her mother authorized J.C.'s admission and treatment pursuant to 50 P.S. § 7201.[5]

---

[4]Attention deficit hyperactivity disorder is a childhood mental disorder characterized by inattention, by hyperactivity and impulsivity, or by both types of behavior.  The behavior interferes with academic, social, or work functioning.  Dorland's Illustrated Medical Dictionary at 547.

[5]50 P.S. § 7201 provides: "Any person 14 years of age or over who believes that he is in need of treatment and substantially understands the nature of voluntary treatment may submit

At the time of discharge to a partial hospitalization program on July 1, 2004, J.C.'s Global

Assessment of Functioning[6] ("GAF") score was 50, denoting serious symptoms.[7]  (R at 141-143)

### C.  Additional Evidence Submitted to the Appeals Council

On April 14, 2005, J.C.'s counsel submitted additional evidence to the Appeals Council.

The additional evidence included the intake assessment and consultation notes from J.C.'s

hospitalization at The Children's Hospital of Philadelphia on September 12, 2004 that previously

had been submitted to the ALJ on September 24, 2004.  It appears, however, that the ALJ did not

consider this evidence,[8] and J.C. therefore resubmitted this evidence to the Appeals Council.

That evidence established that on September 12, 2004, J.C. was admitted, authorized by her

mother under 50 P.S. § 7201, to the emergency department of the Children's Hospital of

Philadelphia for suicidal thoughts.  She had reached for kitchen knives while declaring she

_____

himself to examination and treatment under this act, provided that the decision to do so is made
voluntarily.  A parent, guardian, or person standing in loco parentis to a child less than 14 years
of age may subject such child to examination and treatment under this act, and in so doing shall
be deemed to be acting for the child.  Except as otherwise authorized in this act, all of the
provisions of this act governing examination and treatment shall apply."

[6]GAF scores reflect the mental health specialist's assessment on a particular day of the
severity of a patient's mental health, and are necessarily based on the patient's state of mind and
self-reported symptoms.  Nevertheless, the scores constitute an independent medical evaluation
of the patient's subjective complaints.

[7]GAF scores in the 41-50 range indicate serious symptoms, such as suicidal ideation, or
any serious impairment in social, occupational, or school functioning.  American Psychiatric
Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

[8]In her evaluation of the evidence, the ALJ noted J.C. had been admitted to the Belmont Center
and "[t]here is no evidence of any other hospitalizations for mental health reasons."
[R.16] Some time after her hospitalization at the Belmont Center on June 22, 2004, J.C. had, in
fact, been hospitalized a second time at The Children's Hospital of Philadelphia on September
12, 2004, evidence of which was submitted to the ALJ on September 24, 2004 and subsequently
marked as an exhibit.  The ALJ, however, appears not to have been aware of this fact.

wanted to die, and she also had written a suicide note.  Her GAF rating on admission was 30,[9]

denoting serious impairment, with a diagnosis of depression.  The consulting physician

recommended inpatient psychiatric hospitalization to ensure safety. (R at 158-162).

The remainder of the additional evidence submitted to the Appeals Council consisted of

the following:

○        On August 12, 2004, J.C. underwent a child comprehensive biopsychosocial

evaluation administered by The Consortium, Inc. (R at 163).  The evaluation

noted J.C. behaved inappropriately, oppositionally, and impulsively, heard voices

in her room, had been sexually active since the age of 10, and had been suspended

from school multiple times for fighting and being disrespectful to teachers and

other authority figures.  The evaluation also noted J.C. had been diagnosed as

having ADHD, posttraumatic stress disorder,[10] and schizophrenia,[11] and rated

J.C.'s GAF score at 30. (R at 163-173).

○        A report by Northeast Treatment Centers covering the period from April 22, 2004

---

[9]GAF scores in the 21-30 range indicate behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or the inability to function in almost all areas.  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

[10]Posttraumatic stress disorder is "an anxiety disorder caused by exposure to an intensely traumatic event; characterized by reexperiencing the traumatic event in recurrent intrusive recollections, nightmares, or flashbacks, by avoidance of trauma-associated stimuli, by generalized numbing of emotional responsiveness, and by hyper-alertness and difficulty in sleeping, remembering, or concentrating."  Dorland's Illustrated Medical Dictionary at 550.

[11]Schizophrenia is a mental disorder characterized by disturbances in form and content of thought, mood, sense of self and relationship to the external world, and behavior.  Dorland's Illustrated Medical Dictionary at 1664.

to August 22, 2004, described J.C. as disruptive and disrespectful in class, having difficulties focusing, and physically and verbally aggressive when angered. (R at 189).

○   On August 27, 2004, an initial assessment and psychiatric evaluation performed by the Thomas Jefferson University Hospital Department of Psychiatry and Human Behavior described J.C. to be of above average intelligence but to have restless, impulsive, and "destructible" behavior.  J.C. was also noted to be defiant toward her mother, to have limited anger management and low self-esteem, and was diagnosed with ADHD and ODD with a GAF rating of 55.[12]  (R at 175-186).

○   Letters from J.C.'s school principal and teachers, dated March 29, 2004 and November 18, 2004, described J.C. as verbally abusive to teachers, disrespectful of rules, and physically abusive of other students.[13] (R at 190-194).

○   Journal entries written by J.C. from January, 2003 to February, 2004 related violent and angry thoughts of wanting to hurt people, of being "fed up," and of hating her peers. (R at 195-203).

---

[12]GAF scores in the 51-60 range indicate moderate impairment in social or occupational functioning.  Id.

[13]J.C. also included evidence that appears to have been submitted previously to the ALJ, specifically, a note from a teacher dated April 20, 2004 and a letter from Lisa Matthews dated August 18, 2003. (R at 192, 194). These documents appear to have been marked as exhibits and were considered by the ALJ. (R at 16, 82, 94).  Therefore I do not include them here as new evidence.

## DISCUSSION

### A.  New Evidence

J.C. maintains the ALJ's decision regarding her limitation in the domain of interacting and relating to others is not supported by substantial evidence.  She contends I may consider the new evidence and reverse the ALJ's determination.

A claimant may submit to the Appeals Council "new and material" evidence that relates to the period on or before the date of the ALJ's hearing decision.  See 20 C.F.R. § 404.970(b).[14] The Appeals Council then must "evaluate the entire record including the new and material evidence submitted."  Id.  The submission of the new and material evidence, however, does not require the Appeals Council to grant review.  The Appeals Council will grant review only if it finds that the ALJ's decision "is contrary to the weight of the evidence currently of record."  Id.

When the Appeals Council has denied review, the district court may not review the Appeals Council decision.  "No statutory provision authorizes the district court to make a decision on the substantial evidence standard based on the new and material evidence never presented to the ALJ.  Instead, the [Social Security] Act gives the district court authority to remand the case to the Commissioner, but only if the claimant has shown good cause why such new and material evidence was not presented to the ALJ."  Matthews v. Apfel, supra, 239 F.3d 594.  Moreover, evidence that is new must not be merely cumulative of what is already on the

---

[14]20 C.F.R. § 404.970(b) provides in pertinent part: "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.  It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record."

record.  Evidence that is material must be relevant and probative, related to the period at issue, and there must be reasonable probability that it would have changed the outcome of the Commissioner's determination.  42 U.S.C. § 405(g);  Szuback v. Sec'y of Health and Human Services, 745 F.2d 831, 833 (3d Cir. 1984).

The additional evidence submitted to the Appeals Council includes evidence of a second hospitalization for mental health reasons.  In her evaluation of the evidence, the ALJ noted that other than J.C.'s first hospitalization at the Belmont Center in June 2004, "[t]here is no evidence of any other hospitalizations for mental health reasons." (R at 16).  This establishes the ALJ failed to consider evidence of J.C.'s subsequent hospitalization for suicidal thoughts on September 12, 2004.  The remainder of the evidence includes further evaluations and reports by additional medical professionals documenting the significant changes in J.C.'s mental health status, and J.C.'s personal journal entries providing evidence of her anger, violent thoughts, suicidal wishes, and problems with peers and classmates.

The evidence is new because it demonstrates significant changes in J.C.'s mental health status.  Not only was J.C. hospitalized a second time for suicidal thoughts, but her GAF rating dropped to 30 on two occasions, evidence of which either was not before the ALJ or the ALJ failed to consider.  The evidence is material because it relates to J.C.'s mental health condition, is probative of the severity of her condition, and relates to the period at issue.  Moreover, there appears to be a reasonable probability that the new evidence would have changed the outcome of the Commissioner's determination.  Journal entries from early 2003 and 2004 document J.C.'s thoughts of hating her peers and wanting to hurt people.  J.C.'s additional hospitalization and decrease in GAF scores during August and September, 2004 indicate increasingly serious

impairments in communication and social functioning.  School reports and psychiatric

evaluations from the fall, 2004 time period document that J.C. received multiple school

suspensions for fighting and defiance toward teachers and that there was an increasing severity in

her anger, physical aggressiveness toward authorities, and physical abuse of other students. [15]

There is a reasonable probability that had all of this new evidence been before the ALJ, her

determination of J.C.'s limitation in the domain of interacting and relating with others would

have changed from "less than marked" to "marked" or "extreme."  This determination,

considered along with the ALJ's determination that J.C.'s limitation in the domain of caring for

herself was "marked," would have changed the outcome of the Commissioner's decision.

     Finally, good cause exists for the late submission of the evidence.  First, with regard to

the evidence of J.C.'s second hospitalization on September 12, 2004, it appears that in spite of its

submission to the ALJ, the ALJ simply failed to consider it.  Second, Lisa Young's physical

disability prevented her from discovering the school records and journal entries in time to make

them part of the original record.  Finally, it is reasonable to believe that J.C.'s medical records

from August and September, 2004 were not prepared and ready to submit by the medical

establishments until after the ALJ's decision on September 30, 2004.

     I therefore conclude that because the additional evidence submitted by J.C. was new,

material, and good cause exists for its late submission, this matter should be remanded for further

consideration by the ALJ.    _____

---

[15]The defendant appears to argue that after J.C.'s hospitalization for mental health reasons on June 22, 2004, J.C. seemed to be stable and improving. (Def. Br. at 11).  The new evidence from August, September, and November, 2004 demonstrates, to the contrary, that J.C.'s condition was increasing in severity.

**B.  ALJ's Credibility Finding**

Although the fact finder's credibility determinations are normally entitled to deference, I must nevertheless exercise meaningful review.  Cao v. United States, 407 F.3d 146, 152 (3d Cir. 2005).  The reasons for credibility findings must be substantial and bear a legitimate nexus to the finding, e.g., based on inconsistent statements, contradictory evidence, or inherently improbable testimony.  Id.; accord St. George Warehouse, Inc. v. NLRB, 420 F.3d 294, 298 (3d Cir. 2005) (ALJ credibility determination should not be reversed unless "inherently incredible or patently unreasonable" as long as ALJ considers all relevant factors and explains his decision).  "If the ALJ concluded that plaintiff's testimony was not entitled to belief . . . [s]he is required to explain the basis for h[er] credibility determination."  Cress v. Heckler, 579 F.Supp. 644, 645 (E.D.Pa. 1984) (Troutman, J.)

Here, the ALJ summarily concluded J.C. and her mother, Lisa Young, were not fully credible, but failed to identify specific facts to support her finding.  I therefore recommend that on remand, the ALJ provide an explanation for her credibility determination.

## RECOMMENDATION

AND NOW, this 4th day of October, 2006, IT IS RESPECTFULLY RECOMMENDED that the matter be remanded to the ALJ for consideration of the new evidence and for an explanation of her credibility determination.


BY THE COURT:


\s\ TIMOTHY R. RICE
TIMOTHY R. RICE
U.S. MAGISTRATE JUDGE